# Denis A. Roy and Helen Roy v. Wayne and Waldo Mugford, M & W Polishing Co., and Peerless Granite Company, Inc.

[642 A.2d 688]

No. 92-617

Present: Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.

Opinion Filed April 8, 1994

*Oreste V. Valsangiacomo, Jr.* and *Judith A. Miles* of *Valsangiacomo, Detora & McQuesten, P.C.*, Barre, for Plaintiffs-Appellants.

*Nancy J. Creswell* and *Bernard D. Lambek* of *Paterson & Walke, P.C.*, Montpelier, for Defendants-Appellees.

**Dooley, J.** Plaintiffs Denis and Helen Roy appeal from a decision of the Washington Superior Court denying them attorney's fees on their successful action to recover $20,000 due on a 1987 promissory note. Defendants are Wayne and Waldo Mugford; Peerless Granite Company, a business the Mugfords purchased from plaintiffs by stock sale; and M & W Polishing Company, another business owned by the Mugfords. Defendants cross-appeal the court's decision to allow recovery of the $20,000. We affirm the court's award of the $20,000 plus interest, but reverse and remand for determination and award of attorney's fees.

In the fall of 1986, plaintiffs, who were then in the process of divorcing, decided to sell Peerless Granite Company in order to take advantage of favorable capital gains tax treatment that was to be eliminated after 1986. Denis Roy contacted certain local companies about buying Peerless, and defendants Mugford, who had been contemplating expanding their granite polishing business, showed immediate interest. On December 6, the Mugfords took a tour of the Peerless operation. During this visit, Helen Roy gave them computer-generated balance sheets covering the period July 1984 through November 1986. Plaintiffs explained to the Mugfords that the Peerless accounts would change through the end of December, reflecting normal operating expenses.

To expedite the sale, the parties negotiated a straight stock purchase. The purchase and sale agreement was drafted by the Mugfords' attorney. The closing took place on the evening of December 31, 1986, with plaintiffs signing over all sixteen outstanding Peerless shares, twelve owned by Denis Roy and four by Helen Roy, in exchange for consideration of $670,000. The final price was negotiated down from the plaintiffs' asking price of $700,000. Prior to this closing, the Mugfords neither requested, nor were they provided, with any financial information other than that which they received in early December. They relied, however, on advice and analysis supplied by their accountant.

Although the sale was closed on the evening of December 31, defendants did not complete their permanent financing until a second closing on January 30, 1987. During the second closing, Peerless Granite Company, by Wayne Mugford, executed a $59,000 promissory note to plaintiffs, with final payment due July 1, 1987. Like the purchase and sale agreement, this note was also drafted by defendants' attorney. The final paragraph of this note provided: "In the event of the default of this note, the maker and any endorsers hereof hereby agree to pay all reasonable attorney's fees and the costs of collection necessarily incurred."

During the day of December 31, Helen Roy drew herself a $20,000 bonus check. When she drew the check, Helen Roy was not aware that the Mugfords had decided to purchase Peerless and that the closing would occur that evening. The bonus was

taken pursuant to a temporary divorce stipulation signed by Helen and Denis Roy in September. Plaintiffs had agreed that Helen would take a bonus before year end, which would be treated as salary for her, and that the bonus would then be deposited into a college tuition account for their children. Helen Roy did not disclose the bonus at the closing.

The Mugfords discovered the bonus payment three months later when Helen Roy stopped working for Peerless and was replaced by a new bookkeeper. At that time, defendants asked plaintiffs to explain the payment. Not satisfied with plaintiffs' answer, defendants withheld $20,000 from their final payment on the $59,000 promissory note and placed it in an escrow account for a time, but later withdrew the funds. Plaintiffs subsequently filed suit to recover the $20,000 withheld from the final note payment.

On appeal, plaintiffs' sole argument is that the trial court abused its discretion in failing to award attorney's fees under the promissory note. We agree and reverse and remand for calculation and award of such fees. On cross-appeal, defendants make four arguments that actually reduce to two: (1) the taking of the bonus by check, cashed after the stock was transferred to the Mugfords, violated the purchase and sale agreement as a matter of law; and (2) the court failed to make essential findings to dispose fully of defendants' affirmative defenses and counterclaims. We are not persuaded by defendants' contentions, and, therefore, we affirm judgment for plaintiffs in the amount of $20,000 plus interest. We address defendants' arguments on the underlying judgment before turning to the matter of attorney's fees.

Defendants first argue that plaintiffs breached the stock purchase agreement, requiring reversal of the trial court's judgment as a matter of law. Specifically, defendants contend that when plaintiff Helen Roy wrote the $20,000 bonus check to herself on December 31, 1986, but did not deposit the check until January 6, 1987, she violated Paragraph 6 of the Stock Purchase and Sale Agreement, which states:

> All loans and indebtedness owed to DENNIS A. ROY and HELEN ROY by the [Peerless] corporation will be cancelled on the corporate books as of December 31, 1986, the date of closing.

Citing 9A V.S.A. § 3–802(1) and the accompanying commentary, defendants contend that a check is nothing more than a loan or indebtedness until presented for payment, that is, simply a conditional payment which remains suspended until presented. According to the terms of Paragraph 6, defendants' argument runs, Peerless' indebtedness to Helen Roy in the form of that $20,000 check was cancelled as of the closing and, therefore, plaintiffs breached Paragraph 6 when they took payment on a cancelled obligation from Peerless after December 31.

■ The short answer to defendants' contention is that payment on a check relates back to the time the check is delivered to the payee. See *Ivy v. American Road Ins. Co.*, 398 So. 2d 165, 166 (La. Ct. App.) ("The law is well established that a check is a conditional payment and once the check has made its commercial cycle back to the drawee bank where it is finally accepted and paid, such payment relates back to the time the check was delivered to the payee . . . ."), *rev'd on other grounds*, 409 So. 2d 549 (La. 1981); *Regents of Univ. of New Mexico v. Lacey*, 764 P.2d 873, 875 (N.M. 1988) (payment relates back to time of delivery of check; citing 6 R. Anderson, Anderson on The Uniform Commercial Code § 3–802:19 (3d ed. 1984) and collecting cases); see also *General Motors Acceptance Corp. v. Abington Casualty Ins. Co.*, 602 N.E.2d 1085, 1087 (Mass. 1992) (underlying debt discharged when check delivered to payee and drawn on account with sufficient funds at solvent bank). In this case, payment on the $20,000 bonus check related back to the December 31 delivery date, and therefore was not a loan or debt outstanding as of the closing. As a Louisiana court has observed, the purpose of allowing payment of a check to relate back to the date of delivery

> is both logical and apparent. It is commonplace in today's highly commercialized society to discharge obligations by the use of checks. Many obligations require that payments be made timely or at certain times. Examples are installment notes, insurance premiums . . . and many others. The rule . . . protects the debtor from such claims as possible additional interest, penalties or breach of contract for untimely payment. The rule is designed to allow . . . timely payment by check . . . otherwise it would make the timeli-

ness of payment depend upon the actions of the creditor. Thus a debtor who paid by check would not be assured that his payment was timely even though the check was delivered timely.

*Ivy*, 398 So. 2d at 167.

For the defendants' argument to have any merit, we would have to find that there was no agreement that the check constituted payment. See *Drew v. Chrysler Credit Corp.*, 596 F. Supp. 1371, 1376 (D. Mo. 1984) ("Where there is no agreement that the check itself shall constitute payment, a 'satisfaction' does not occur until payment of the check has actually been received."). There is no evidence suggesting that Helen Roy did not intend that the check constitute payment of her 1986 bonus salary.

■ Even outside of the relation-back doctrine, defendants' argument would fail because it neglects other, more relevant sections of Article 3 of the Uniform Commercial Code. Under the Code, the check Helen Roy drew was a negotiable instrument. See 9A V.S.A. § 3–104 (defining negotiable instrument, including check). A check is "a draft drawn on a bank and payable on demand." *Id.* § 3–104(2)(b). In turn, instruments payable on demand "include those payable at sight or on presentation and those in which no time for payment is stated." *Id.* § 3–108. Presentment is simply the demand for payment. 1 J. White & R. Summers, Uniform Commercial Code § 13–11, at 649 (3d ed. 1988). Under the terms of § 3–503:

> (2) A reasonable time for presentment is determined by the nature of the instrument . . . . In the case of an uncertified check which is drawn and payable within the United States and which is not a draft drawn by a bank the following are presumed to be reasonable periods within which to present for payment or to initiate bank collection:
>> (a) with respect to the liability of the drawer, thirty days after date or issue whichever is later . . . .

Helen Roy was well within the thirty-day period for presentment of the Peerless check when she deposited the check six days after its date and issue.

Returning to defendants' argument that the check was a suspended indebtedness cancelled by Paragraph 6, we find defend-

ants' reading of § 3–802 incorrect. This section is simply "a tidying-up provision. It states the legal effects on the *underlying obligation* when one takes a negotiable instrument for that obligation, and it states the legal effects on the underlying obligation when the obligation on the instrument is discharged." 1 J. White & R. Summers, *supra*, § 13–23, at 684 (emphasis added) (footnote omitted). The underlying obligation is "the original obligation between the parties which led to issuance of the negotiable instrument . . . . In most cases, this obligation will be a contract . . . . " *Id.* § 13–23, at 684–85. Here, the underlying obligation was the obligation of Peerless to pay Helen Roy a bonus as agreed by the then-owners of Peerless; the $20,000 check was a negotiable instrument given to discharge that obligation.

The discussion of suspension in § 3–802 refers not to the suspension of the negotiable instrument, but rather suspension of the right to bring an action on the underlying obligation. See *id.* § 13–23, at 685 (discussing § 3–802 and noting that "issuance of a check in the usual circumstance does not discharge the obligation but merely suspends it"). Thus, the check remains a valid instrument, and the right to sue on the obligation—here the $20,000 bonus—is suspended until and if the check is not honored by the bank to which it is presented. See 9A V.S.A. § 3–802 comment 3.

We turn now to the second argument raised by defendants: that the court failed to make findings essential to the disposition of their affirmative defenses and counterclaims. As defendants correctly point out, when requested, the court had a duty to make findings essential to the disposition of the issues properly before the court. See *Jacobs v. Jacobs*, 144 Vt. 124, 127, 473 A.2d 1165, 1167 (1984). In this case, plaintiffs requested findings on the record at the close of the evidence, thus triggering the court's obligation to make findings. See V.R.C.P. 52(a). The findings must indicate to the parties and this Court what was decided and how the decision was reached. See *In re J.R.*, 147 Vt. 7, 11, 508 A.2d 719, 721 (1986).

Although defendants raised numerous theories to avoid paying the remaining amount due on the note, with two exceptions all theories centered on the propriety of the $20,000 bonus pay-

ment. Emphasizing "the real dispute in this case," the court made detailed findings about the bonus. The court found the bonus was appropriate and legitimate because: (1) based on the gross sales and earnings of Peerless, plaintiffs were entitled to take a salary payment that included the bonus; (2) the total salaries taken in 1986 were comparable to those taken in 1984 and 1985; (3) when Helen Roy withdrew the bonus, she did not know the Mugfords had decided to purchase Peerless; (4) the year-end bonus was taken in the ordinary course of business for tax purposes; and (5) payment of the bonus did not dilute the value of the Peerless stock purchased by the Mugfords. Also relevant to the court's conclusion were findings that plaintiffs had taken a $50,000 bonus in 1985, that the Mugfords were aware of this bonus, and that the agreement between the Roys for Helen Roy to take the bonus at issue here had been reached months earlier in the divorce stipulation.

Having determined that the bonus was legitimate and appropriate, the court gave short shrift to defendants' theories:

> Taken as a whole, the credible evidence does not support a finding that the year-end "bonus" was inappropriate; or that the Roys misrepresented the assets of Peerless; or committed any fraud or inequitable conduct toward the Mugfords; or breached their contract with the Mugfords; or converted any money that rightfully belonged to the Mugfords; or breached any duty of good faith and fair dealing that they owed to the Mugfords.

Essentially, defendants' argument is that the above conclusions, and the facts found to support them, are too summary in light of defendants' theories.

Defendants layered theories upon theories, without clearly choosing among them and pursuing a particular line of attack. Thus, as affirmative defenses related to the bonus, defendants raised equitable setoff, breach of contract, fraud, equitable estoppel, and "[i]ntentional and/or negligent misrepresentation." As counterclaims, they raised breach of contract, breach of duty of good faith and fair dealing, misrepresentation or mistake to allow for reformation, and fraudulent and inequitable conduct such as to allow a setoff of the bonus amount.

The trial court believed it addressed all these theories by its findings and conclusions with respect to the bonus. In the trial

court's view, the bonus was a proper expenditure, taken in the ordinary course of business, pursuant to a prior agreement, by a business owner who had earned the bonus and did not know she was about to sell the business. Although the trial court findings could have been more detailed and its reasoning more explicit, we do not find reversible error. Some of defendants' theories were unsupported in law or fact. One such example is defendants' argument that plaintiffs violated Paragraph 6 of the stock purchase and sale agreement, which we resolved earlier in this opinion. Another, related example is defendants' theory that plaintiffs violated Paragraph 7 of the agreement, in which plaintiffs represented that the transfer of stock transferred all property of Peerless including bank deposits as of December 31, 1986. Defendants argued that because the check was not cashed until January 6, 1987, the bonus payment took money from the business after December 31st in violation of Paragraph 7. Our resolution of the Paragraph 6 claim also resolves this claim.

Many of defendants' contentions were necessarily concluded by the findings and conclusions, however sparse. Most of the equitable claims and defenses were clearly concluded. For example, the court found that the bonus was not inconsistent with a duty of good faith and fair dealing inherent in the stock purchase agreement, given the nature of the bonus and the circumstances surrounding it. Assuming the duty could apply to preconsummation conduct, we believe the findings and conclusions show no breach of this duty. See generally *Carmichael v. Adirondack Bottled Gas Corp.*, 161 Vt. 200, 208–09, 635 A.2d 1211, 1216–17 (1993) (covenant of good faith and fair dealing implied in every contract protects against bad faith that would violate community standards of decency, fairness or reasonableness; good faith is ordinarily a question of fact). This analysis also made untenable defendants' equitable estoppel theory. See *Greenmoss Builders, Inc. v. King,* 155 Vt. 1, 6, 580 A.2d 971, 974 (1990) (equitable estoppel is based on "fair dealing, good faith and justice"). Similarly, defendants had no right to a setoff or reformation based on equitable principles.

Defendants' main claims of fraud were similarly concluded because the court found no misrepresentations were made. Thus, defendants' claims for deceit and negligent misrepresen-

tation are precluded as a matter of law given that such actions only lie upon a threshold finding of a misrepresentation. See *Lewis v. Cohen*, 157 Vt. 564, 568, 603 A.2d 352, 354 (1991) (deceit); Restatement (Second) of Torts § 552(1) (1977) (negligent misrepresentation). The court's findings also preclude recovery under an unintentional misrepresentation theory, even assuming that it might be grounds for reformation of contract. See *Hardwick-Morrison Co. v. Albertsson*, 158 Vt. 145, 150, 605 A.2d 529, 533 (1992) (constructive fraud requires wrongful act and may allow nondamage remedy).

■ Defendants also argued fraudulent concealment, however, and the court's findings and conclusions do not clearly address this theory. Even without a finding of misrepresentation, the court could conclude that nondisclosure of material fact was actionable if there was a duty to disclose. See *Silva v. Stevens*, 156 Vt. 94, 103, 589 A.2d 852, 857 (1991). The duty to disclose can arise from a relationship of trust and confidence, superior knowledge or means of knowledge. See *id.*

■ For two reasons, we do not believe this theory is viable here, and, therefore, the failure of the court to address it is harmless. First, the nondisclosure must be made with an intention to mislead or defraud. See *White v. Pepin*, 151 Vt. 413, 416, 561 A.2d 94, 96 (1989). The court found that after Helen Roy made out the bonus check, "it didn't occur to her that she should tell the Mugfords." That finding is inconsistent with an intent to defraud.

■ Second, this is a case in which defendants had an obligation to make an independent inquiry of the facts to protect their own interests. See *Lewis*, 157 Vt. at 568–69, 603 A.2d at 354 (in context of relationship, party may be unable to defend action on contract absent showing of justifiable reliance on misrepresentation; such reliance may be precluded by showing that but for party's own neglect, party would have discovered wrong); *Silva*, 156 Vt. at 105, 589 A.2d at 858–59 (independent inquiry must be made if clear from parties' relationship that such inquiry should precede one party's reliance on other party's representations). This was an arm's-length business transaction. Defendants were given all information they requested, and they had the assistance of an accountant. As the court emphasized,

the information given disclosed the 1985 bonus and the salary history. See *Wright v. Doolin*, 158 Vt. 317, 319, 607 A.2d 1137, 1138 (1992) (business sellers' failure to disclose loss of customer not actionable as purchasers were provided with adequate information, including access to company records and customer lists, and nature of business made customer profile "a likely subject to be explored by a would-be purchaser"). Defendants' lawyer drew up the purchase and sale agreement. The transaction was structured as a stock sale, which placed a premium on knowing the state of the business on the date of sale and ensuring the assets were intact. Yet, defendants had no information concerning what had occurred in the month prior to the sale or about the financial state of the business as of the date of sale. The contract gave them no protection.

Defendants attempt to liken this sale to the transaction in *White v. Pepin* in order to argue that the time constraints imposed by plaintiffs prevented proper factual investigation. See 151 Vt. at 417–18, 561 A.2d at 97. Although there were time constraints involved in the sale of Peerless, the record does not support defendants' contention that the timing prevented defendants from undertaking an independent examination of the state of the business or the inclusion of provisions in the agreement to protect against what occurred. Indeed, the use of legal and financial advisors shows that the Mugfords had the capacity to protect their interests.

In connection with their affirmative defenses and counterclaims, defendants also argue that one of the court's critical findings is not supported by the evidence. Specifically, they argue that there is no evidence to support the fact that the bonus payment did not affect the value of the Peerless stock purchased by the Mugfords. We must uphold the court's finding unless it is clearly erroneous. See V.R.C.P. 52(a)(2). Although there was no evidence of the value of the Peerless stock, defendants' accountant testified, in response to a question about the significance of the bonus as follows:

> Probably in a case like this, I guess in retrospect, the bonus situation to me wasn't all that important because it was— there was a case of buying what they thought they were getting for assets and liabilities of the business . . . .

The "finding" to which defendants object is actually a conclusion that the payment of the bonus "did not dilute the value of the Peerless stock." The testimony of the accountant supported this conclusion, and therefore is not clearly erroneous. See *Bills v. Wardsboro School Dist.*, 150 Vt. 541, 544, 554 A.2d 673, 675 (1988) (findings not clearly erroneous if supported by reasonable and credible evidence). In any event, we believe that, in context, the trial court was saying that the taking of the bonus did not dilute the value of the stock below that reasonably expected by defendants. This conclusion is supported by the court's findings that plaintiffs' total compensation, including the bonus, was justified by sales and earnings and was in line with past compensation. We see no error in this conclusion.

■ Defendants also have raised two theories that do not involve the propriety of the bonus, to which we now turn our attention. Defendants briefed and argued to the trial court both accord and satisfaction, and laches. The court failed to address either defense. Although this was error, we conclude the error was harmless because neither theory was supported by the evidence before the court. See V.R.C.P. 61 (error not cause for modification of judgment unless it affects "the substantial rights of the parties").

We first address defendants' claim of accord and satisfaction. On July 1, 1987, defendants tendered plaintiffs a check for $28,803.04, which represented the amount outstanding on the promissory note ($48,803.04) less the contested $20,000 bonus amount. Defendants marked the "remittance advice" attached to the check as "pay off." Plaintiffs subsequently cashed the check. One day earlier, however, the attorney for the Mugfords sent a letter to plaintiffs' counsel describing the dispute over the bonus and stating:

> There is a $50,000 payment due on July 1st to your clients. I have advised my clients to pay $30,000.00 and escrow the balance of $20,000.00.
>
> Once we can meet and find out why this occurred, we can resolve who is entitled to the remaining $20,000.

The $20,000 was put in escrow as stated in the letter. Defendants argued below that the acceptance of the "pay off" check constituted an accord and satisfaction with respect to the

amount due on July 1, 1987—that is, the remainder of the amount due on the promissory note.

A party claiming the defense of accord and satisfaction must prove that: (1) the claim is disputed; (2) the party offered to pay less than the amount allegedly due; and (3) in full settlement of the claim, the other party accepted and retained the lesser amount offered. *Eccomunity, Inc. v. Lussier*, 147 Vt. 276, 278, 514 A.2d 711, 713 (1986); see also *Frangiosa v. Kapoukranidis*, 160 Vt. 237, 244, 627 A.2d 351, 355 (1993) (for negotiable instruments governed by the UCC, creditor can avoid the third element by a reservation of rights). As to the second element, the amount tendered "must clearly be offered in full satisfaction of the claim." *Union Bank v. Jones*, 138 Vt. 115, 124, 411 A.2d 1338, 1344 (1980). This defense may be a matter of fact or law, but when "'the evidence leaves no room for opposing inferences it is one of law.'" *Eccomunity, Inc.*, 147 Vt. at 278, 514 A.2d at 713 (quoting *Curran v. Bray Wood Heel Co.*, 116 Vt. 21, 23, 68 A.2d 712, 715 (1949)). We find this to be the case here.

The evidence would not have allowed the trial court to conclude that the second element was present. The letter and the escrow arrangement conclusively established that defendants did not tender the July 1st check in full satisfaction of the claim. In this context, the use of the words "pay off" did not clearly convey a message that cashing the check would extinguish plaintiffs' claim for the remaining $20,000.

The remaining defense raised by defendants was labeled "waiver and laches" and went solely to the recovery of any prejudgment interest. The trial court awarded interest calculated at nine percent, the rate specifically provided in the promissory note. As the factual base for their defense, defendants showed that plaintiffs were aware of the dispute over the $20,000 in March of 1987, but failed to bring suit until May of 1991. They argued that the delay in bringing the suit was unreasonable and should preclude the recovery of interest.

Although labeled as "waiver" or "laches," defendants' theory is actually that the trial court has the discretion to deny prejudgment interest in an appropriate case, and this is an appropriate case. We have held, however, that when the damages are liquidated or readily ascertainable, interest "is a legal right

of the plaintiff." *VanVelsor v. Dzewaltowski*, 136 Vt. 103, 106, 385 A.2d 1102, 1104 (1978); see also *P.F. Jurgs & Co. v. O'Brien*, 160 Vt. 294, 304, 629 A.2d 325, 331–32 (1993) (citing Reporter's Notes to 1981 Amendment, V.R.C.P. 54(a)). This rule is particularly appropriate when, as here, defendants have contractually obligated themselves to pay interest. Because the trial court had no discretion to refuse plaintiffs the prejudgment interest, defendants' theory has no merit.

Finally, we turn to plaintiffs' argument that the trial court abused its discretion by failing to award attorney's fees under the terms of the promissory note. The trial court based its refusal to award fees on two factors: (1) plaintiffs "could have been more explicit about their business practices and thereby averted this lawsuit," and (2) "the fact that the so-called 'bonus' was the real issue in this case, rather than the balance due on a note."

We have enforced contractual provisions in negotiable instruments making the debtor responsible for collection costs, including attorney's fees, to "aid in insuring to the holder the full proceeds of the note." *Young v. Northern Terminals, Inc.*, 130 Vt. 258, 260, 290 A.2d 186, 188 (1972); see also *Ianelli v. Standish*, 156 Vt. 386, 389, 592 A.2d 901, 903 (1991) (enforcing "unambiguous and clearly applicable" attorney's fee provision in real estate purchase contract). The question of what constitutes a reasonable attorney's fee is one of fact. See *Young v. Northern Terminals, Inc.*, 132 Vt. 125, 129, 315 A.2d 469, 471 (1974). We have authorized the trial court to consider a wide range of factors in making this determination, *id.* at 129–30, 315 A.2d at 472, and accorded it "a large measure of discretion" in determining reasonableness. *Id.* at 130, 315 A.2d at 472.

We do not believe, however, the court's discretion is broad enough to allow it to deny any recovery of attorney's fees when plaintiffs prevail. See *Marlowe v. Der-Hart Assocs.*, 680 P.2d 716, 717–18 (Or. Ct. App. 1984); *Singleton v. Frost*, 742 P.2d 1224, 1228 (Wash. 1987). Failure to award at least some fees would deny plaintiffs the benefit of the contract freely entered into by the Mugfords.

Although plaintiffs are entitled to an attorney's fee award in some amount, we agree that the court could consider

plaintiffs' actions in resolving, or failing to resolve, the dispute prior to litigation in determining what is a reasonable award. On the other hand, we do not agree with the trial court's view that the amount of attorney's fees should be affected because the underlying dispute was over the bonus, especially in light of defendants' attempt to resolve this dispute by refusing to pay the full amount due on the note. Nor do we believe the fee amount should be reduced because part of the attorney's representation went to defend against counterclaims raised by defendants. As discussed above, the counterclaims were closely related to the claims and affirmative defenses so they were "integral to the action for collection" of the promissory notes, and plaintiffs had to defend against them to collect on the promissory note. *Wright*, 158 Vt. at 321–22, 607 A.2d at 1139–40.

*The court's order denying plaintiffs recovery for reasonable attorney's fees is reversed and remanded for proceedings not inconsistent with this opinion; in all other respects, the judgment is affirmed.*